Gholson, J.
There are two particulars shown by the act of March 20] 1851, which are claimed to affect the identity of the plaintiff in error with the company for whose stock the defendant contracted; and all the authorities show that this is a question of substantial identity. A like principle would apply as in the case of any other contract in which a party contracted for an article to be furnished. He can not be required to take one substantially different from the one in contemplation between the parties at the time of the contract. The Pennsylvania and Ohio Canal Co. v. Webb, 9 Ohio, 136; Everhart v. Philadelphia and Westchester Railroad Co., 28 Penn. St. 339-352; Banet v. Alton and Sangamon Railroad Co., 13 Illinois, 504; Midland Railroad Co. v. Gordon, 16 M. & W. 804, 808.
The plaintiff sued upon a contract which, in form, was *not made with it, and we are really required by the plaintiff to say that, as a matter of the law, the two companies are the same. If we are not able so to say, the plaintiff shows no ground of action.
The first particular in which the identity of the Belpre and Cincinnati Railroad Company is claimed to have been affected by the act amending the charter of the Franklin and Ohio River Railroad Company, passéd the 20th of March, 1851, is as to the point from which the original Belpre and Cincinnati Railroad was to be constructed. There can be no doubt that the point on the Ohio river at which the latter road was intended by its charter to commence, was some point opposite Parkersburg, Virginia, or at Harmar, in Washington county. By an act of the legislature, passed 7th of March, 1850, which was before the subscription made by the de *48 fendant, the Belpre and Cincinnati Railroad Company was authorized to construct their road to any point so as to connect with any railroad, or other improvement constructed to the Ohio river, on the easterly side thereof, within the State of Virginia. But this law did not affect the power or duty to select the point at which, under its charter, the road should commence, for the latter power might be exercised by an extension from that point.
The evident object in view of the act of the 20th of March, 1851, was the subscriptions of the county of Washington, and the towns of Marietta and Harmar. There were two railroad projects, apparently quite different, to which those subscriptions were sought to be directed. It was to be made a condition as to 'both, that the road to be constructed should terminate at, or pass through, the town of Marietta, and the subscriptions could only be made and received upon that condition.
It is difficult to escape the conviction that, both in intent and in fact, this condition interfered with the discretion to select as the point at which the Belpre and Cincinnati Railroad should commenee, a point opposite ^Parkersburg, Virginia, and that as soon as the subscriptions were received upon the condition named, Marietta became one of the termini of the road. It was in this view, undoubtedly, that a change of name was directed.
This may, and very probably was, a wise and good policy on the part of those controlling the project, but we can not say that it was, in reference to all persons who became interested in the project, an immaterial change. A change of one of the termini of a road has ever been regarded important, for it is a particular upon which the character and success of a road must essentially depend.
There is another particular in which the powers and franchises of the company which should accept the subscriptions of the towns of Marietta and Harmar, were increased and turned in a direction which could scarcely have been contemplated by those subscribing for the stock of the Belpre and Cincinnati Railroad Company. By section 15 of the act of the 20th March, 1851, it is provided, “ that the company to whose capital stock any subscriptions shall be made under this act, by the commissioners of said Washington county, or the town councils of said towns of Marietta and Harmar, shall have power to purchase, own, control, and dispose of, or contract for the use of such number of steamboats and other water-crafts, as the company may require for the purpose of ferriage, or *49 of transporting passengers and freight to and from the easterly terminus of the road, to any points on the Ohio or Muskingum rivers.”
"When an act of the legislature is passed, amending the charter of a railroad company, it may be that it would not affect the company, until there had been an acceptance by the governing body of the corporation. But if the act provides for- amendment in several particulars, and does not expressly authorize that some may be accepted and some rejected by the corporation, it is clear that no right to do so can be implied; that it would be clearly unreasonable. The grant of powers must be taken as it is offered or not at all; and the company in this case having accepted the ■ subscriptions, can not say that it is not invested with the powers conferred by the act. The proposition, therefore, of the counsel of the plaintiff, that it has not adopted this section as a part of its charter, can not be maintained.
Nor do we think the proposition, that the fifteenth section contained nothing more than a-ferriage privilege, so as to connect with a railroad terminating on the Virginia side of the river, can be maintained. The words are too clear and plain to admit of any such conclusion. Under those words the company is authorized to engage in the business of transporting passengers and freight to and from its eastern terminus on the river and any points on the Ohio and Muskingum rivers. It might establish lines of packets to and from Wheeling, or any other point on the Ohio river.
That such a power is beyond any fair scope of the powers incident to a railroad company is quite clear from its nature, and has been directly adjudged in a recent authority. An Indiana railroad" having its terminus at Madison, in that state, undertook to establish a line of packets on the Ohio river, and for that purpose bought and agreed to pay for a steamboat. It was adjudged by the Supreme Court of the United States that this was a contract beyond the powers of the company and could not be enforced. Pearce v. Madison and Indiana Railroad Co., 21 How. 441. It was one which its very nature showed, to those contracting, to be outside of the legitimate business of the company as a railroad corporation, and to be connected with a new trade or business, into which the corporation had no power to enter.
The same principle would preclude the idea of compelling the defendant to embark his capital upon such enterprise without his *50 consent. He may well say, “I have ^agreed to become interested in a railroad company, and have contracted in view of the profits to be expected and the perils and losses incident to that description of business; but I have not agreed, that those to be intrusted with the capital I contribute, shall have power to use it in a business of a different character and attended with hazards of a different description.” This is the appeal now made to us by the defendant, and we are unable to see that any satisfactory answer to it has been or can be given. The defendant is not to be regarded, in view of the present action, as one already a stockholder in the company, and complaining of acts done in his behalf, by the constituted authorities of the company, but as one whom it is sought to make a stockholder by enforcing a contract for that purpose. He has a right, therefore, to stand upon the terms of that contract, and in view of them, we do not think the plaintiff in the petition has shown a right of action.
The demurrer must be sustained, and the cause remanded, so as to give an opportunity to amend, if it shall be deemed proper by the district court to allow an amendment.
Brinkeehoee, C. J., and Scott, Sutliee, and Peok, JJ,, concurred.